# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
May 26, 2021 Session

## STATE OF TENNESSEE v. THOMAS MCLAUGHLIN

**Appeal from the Criminal Court for Union County**
**No. 5328    E. Shayne Sexton, Judge**

_____

### No. E2020-01434-CCA-R3-CD
_____

The Defendant-Appellant, Thomas McLaughlin, was convicted by a Union County jury of vehicular homicide. See Tenn. Code Ann. § 39-13-213. The Defendant also pleaded guilty to one count each of driving on a revoked license, violating the financial responsibility law, driving without registration, and driving without registration plates. The trial court classified the Defendant as a persistent offender and imposed a total effective sentence of 15 years. On appeal, the Defendant contends that: 1) he was unfairly prejudiced by the introduction of evidence of his toxicology reports and license status; 2) the evidence is insufficient to sustain his conviction for vehicular homicide; and 3) his sentence is unlawful because the trial court erroneously applied aggravating factors.[1] Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Zachary R. Walden (on appeal) and Joseph A. Fanduzz (at trial), Knoxville, Tennessee, for the Defendant-Appellant, Thomas W. McLaughlin.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Jared Effler, District Attorney General; and Tyler Hurst, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] Because the Defendant has conflated aspects of his sufficiency of the evidence argument with his admissibility of evidence argument, we have reordered the issues for clarity.

# OPINION

This case arises from the March 24, 2017 car crash in which the Defendant struck the car of the victim, Roy Maples, who was killed as a result of the crash.

On July 10, 2017, the Union County Grand Jury returned a seven-count indictment against the Defendant, charging him with vehicular homicide by recklessness (Count 1), driving on a revoked license (Count 2), violation of the financial responsibility law (Count 3), driving without registration (Count 4), driving without registration plates (Count 5), possession of methamphetamine (Count 6), and possession of drug paraphernalia (Count 7). Counts 6 and 7 were ultimately severed and dismissed. On September 27, 2018, the Defendant filed a motion in limine, seeking to suppress his toxicology reports and the correlating testimony. The Defendant argued that the toxicology reports showing the presence of marijuana and methamphetamine in the Defendant's system at the time of the car crash was "prejudicial" and would "confuse the jury" because the Defendant was charged with vehicular homicide by recklessness, not by intoxication. The State argued that the toxicology report was just "one of the many pieces of evidence of recklessness" and was not "overly prejudicial[.]" The trial court agreed with the State and denied the Defendant's motion, reasoning that "the probative value outweighed any undue prejudice" under Tennessee Rule of Evidence 404.[2]

At trial, Paul Maples testified that he was a distant cousin of the victim, Roy Maples.[3] Paul stated that on March 24, 2017, he was standing in his driveway, which was located on Little Valley Road, the two-lane road where the crash occurred. He was talking on the phone with his girlfriend when he saw Roy proceeding down the street in his truck. He stated that Roy was driving "maybe 20 miles an hour . . . not fast at all" and was in his lane. Paul lost sight of Roy and then heard a "real loud noise," which was loud enough that his girlfriend was able to hear it over the phone. He told his girlfriend that he thought "'Roy might have just wrecked[,]'" and he "jumped in [his] car" and drove down the road to where Roy's truck was located. Upon arriving at the crash scene, Paul saw Roy "partially hanging out his front door, had a cut on his head here . . . and I tried to talk to him, told him who I was and all that stuff, but he never could answer me or anything. And I could hear gurgling in his chest and everything."

On cross-examination, Paul described the crash site as a "rolling hill" in the road.

---

[2] We note that the trial court referenced a balancing test under Tennessee Rule of Evidence "404," but it is unclear from the record whether it was referencing the Rule 403 balancing test or the balancing test under Rule 404(b). The test was not otherwise mentioned, and the Defendant never referenced a Rule 403 or 404(b) test.

[3] Because the witness and the victim share the same surname, we will refer to them by their respective first names. We intend no disrespect in doing so.

Allen Beeler testified that he also lived on Little Valley Road, the road where the crash occurred. He stated that on March 24, 2017, he heard "an explosion . . . something just really loud." He then went outside and saw the two crashed vehicles. Upon seeing the vehicles, Beeler called 9-1-1 and then proceeded towards the vehicles. He saw the Defendant walking towards him and informed him that he had called 9-1-1. Beeler knew who the Defendant was because they were "kind of neighbors." The Defendant used Beeler's phone, and Beeler then ran to the vehicles. He saw Roy in his vehicle and stated that he "was in really bad shape." He called 9-1-1 again and requested they send Lifestar, a medical transport helicopter, because Roy appeared to be "taking his last breath." He advised 9-1-1 that the helicopter could land in his field, which was directly next to the crash site.

On cross-examination, Beeler affirmed that he asked the Defendant not to leave his property until police arrived. He stated that he noticed the Defendant was bleeding from his arm and had cuts on his face.

Trooper John Capps testified that he was employed by the Tennessee Highway Patrol ("THP"). He stated that on March 24, 2017, he was dispatched to respond to a car crash on Little Valley Road. Upon arriving at the scene, Trooper Capps saw that the fire department, sheriff's department, and rescue vehicles were already at the scene. He "positioned his vehicle on the south end of the crash" in order to warn oncoming traffic about the crash. A sheriff's deputy gave Trooper Capps "a synopsis of the scene," and he got into the ambulance with the Defendant to get an initial statement and to request a blood sample. Trooper Capps explained that it was customary to request a blood sample when investigating a fatality crash, and the Defendant consented to providing a sample. Trooper Capps provided a Tennessee Bureau of Investigation ("TBI") "blood kit" to emergency medical services to administer the blood draw. Trooper Capps also requested a supervisor at the crash scene. He then began taking pictures and noting evidence that "might dissipate" before a supervisor or the Critical Incident Response Team ("CIRT") arrived at the scene. Trooper Capps explained that CIRT responds to "crashes with charges that are of a serious nature and aid the trooper that's on scene" and "process[es] that scene and com[es] to conclusions based on the roadway evidence."

Trooper Capps testified that just before he arrived on scene, a sheriff's deputy notified him over the radio that the victim had died. He went to view the victim in an ambulance "to verify that [he had died] for [himself]" around the time he obtained the blood sample from the Defendant. Trooper Capps affirmed that THP began taking photographs of the scene, and CIRT also took photographs upon arrival. Photographs from the scene were received as exhibits. Trooper Capps identified a photograph of the victim's speedometer "locked" at "approximately 23 miles per hour." After Trooper Capps and

CIRT finished processing the scene, the two vehicles were loaded onto wrecker trucks, and Trooper Capps and a trooper from CIRT went to the hospital. At the hospital, the troopers interviewed the Defendant, who had already been "treated and released." Trooper Capps affirmed that the Defendant spoke with them voluntarily and had been advised of his Miranda rights and subsequently waived them. The Advice of Rights form and Waiver of Rights form were received as exhibits. A recording of the troopers' interview with the Defendant was also received as an exhibit.

During the interview, the Defendant told Trooper Capps that he had taken a nap at his mother's house and left her house in the vehicle around 3:45 p.m. He was driving south on Little Valley Road, and the victim was driving north. The Defendant stated that he looked down to shift into fourth gear and when he looked up, he saw the victim driving "in three-quarters of [his] lane." He further stated that he typically drove close to the center lines in order to avoid ditches, and thus he and the victim both swerved away from the center line in an attempt to avoid crashing. The Defendant told the troopers that he thought the two vehicles only barely collided, hitting headlight to headlight. The Defendant stated that he was driving 40 miles per hour at the time of the crash and had not consumed any drugs, other than an antibiotic, in the 24 hours preceding the crash. He finally stated that he smoked marijuana at least once every day. Trooper Capps testified that he learned over the course of his investigation that the Defendant did not have insurance, was driving a vehicle displaying plates that were not registered to that vehicle, and was driving with a revoked license.

On cross-examination, Trooper Capps affirmed that the victim was not wearing a seatbelt at time of the crash and that the Defendant was wearing a seatbelt. He agreed that a field sobriety test of the Defendant was not administered. He further agreed that no drugs or drug paraphernalia were found in the vehicle that the Defendant was driving. Trooper Capps testified that he learned during his investigation that the vehicle the Defendant was driving was registered to another person, and the Defendant informed him that it was not registered to him because he was "buying that vehicle." The Defendant also told Trooper Capps that he awoke at "10:30 in the morning" on the day of the crash and "smoked some [m]arijuana." Trooper Capps agreed that at the time of the crash, the Defendant's vehicle was coming down a hill while the victim's vehicle was heading up the hill. He opined that the victim's truck did not have airbags based on the year model.

Agent Melanie Carlisle testified that she was employed by the TBI Crime Laboratory as a special agent forensic scientist in the alcohol toxicology unit and as a Violent Crime Response Team leader. Agent Carlisle was accepted by the court as an expert in "forensic sciences, specifically toxicology." She testified that she processed the Defendant's blood samples. She identified the Defendant's alcohol report, which was received as an exhibit. The Defendant tested negative for alcohol. Agent Carlisle also

identified the Defendant's "Carboxy-THC" report, which was received as an exhibit. The Defendant tested positive for "11-Nor-Carboxy, Delta-9-THC at 44 nanograms per milliliter," which she explained was a metabolite of marijuana. Agent Carlisle explained that it was an "inactive metabolite, so it doesn't mean anything about effect. It just shows that they did smoke or ingest [m]arijuana at some point in time." She explained that at the time of the analysis, the TBI lab did not test for the active drug for THC, so she sent the blood sample to another laboratory. She identified the report from that lab, which showed the Defendant tested positive for THC at two nanograms per milliliter.

Agent Carlisle explained that marijuana was a "hallucinogenic" that could "cause you to vary in your behaviors" and in higher doses "cause you to hallucinate or cause illusions." She testified that based on the amount in the Defendant's system, it could have been "ingested fairly recently" or "smoked chronically[.]" She agreed that the levels "could be" consistent with someone smoking marijuana a few hours before the blood sample was taken. Agent Carlisle finally identified the Defendant's "basic drug analysis report," which was received as an exhibit. The Defendant tested positive for amphetamine "at less than .05 micrograms per milliliter" and methamphetamine at less than .05 micrograms per milliliter.[4] Agent Carlisle explained that methamphetamine is "a central nervous system stimulant" that "will give you a boost of energy" but causes "you to go into a crash phase" when "coming off the high and . . . can make you very drowsy[.]" She further explained that amphetamine was a metabolite of methamphetamine. She agreed that methamphetamine was typically detectable in a blood sample 24 hours after consumption.

On cross-examination, Agent Carlisle conceded that based on the level of marijuana present in the Defendant's blood analysis, she could not say definitively whether he was a "chronic user" or had consumed marijuana within a few hours preceding the blood draw. She explained that even a chronic user would not be able to "hide" certain "signs and symptoms" of marijuana use, and "[s]pecially trained" law enforcement would be able to see those signs and symptoms. Agent Carlisle reiterated that based on the level of methamphetamine in the Defendant's blood analysis, there was no way to tell when it had been consumed, and she could only narrow the timeframe down to the 24 hours preceding the blood draw. She stated that a person with that level of methamphetamine in his or her system may not even display "the signs of [m]ethamphetamine" use depending on how recently it was ingested.

---

[4] We note that although the transcript states that the Defendant tested positive for methamphetamine at less than .5 micrograms per milliliter, the actual toxicology report reveals that he tested positive for methamphetamine at less than .05 micrograms per milliliter.

On redirect examination, Agent Carlisle stated that it was "possible" that a hypothetical person who "slept until 10:30 [in] the morning and then took a nap midday prior to 3:00 p.m., and then they were yawning that evening around 6:00 or 7:00" was exhibiting signs consistent of being drowsy after "coming down off of [m]eth[.]" She explained that anyone who consumed a stimulant like methamphetamine would first have stimulating effects but would later have "the crash phase[,]" which occurs from "coming off the high of a drug" and "insomnia because they haven't slept for long periods of time because of the drug." On recross-examination, Agent Carlisle agreed that drowsiness could also occur "because somebody was up l[ast] night watching movies[.]"

THP Sergeant Charles Randall Massengill testified that he was employed as a CIRT crash reconstructionist. He was accepted by the court as an expert in crash reconstruction, and his resume was received as an exhibit. Sergeant Massengill stated that he received a call from one of the troopers who worked directly with him that he was going to need assistance investigating the crash scene. Sergeant Massengill went to the crash scene on March 28, 2017, and began taking measurements of the roadway and evidence at the crash scene. He identified a scale diagram of the crash scene, which he explained was "a little longer than" a football field. Photographs of the crash scene were received as exhibits. Sergeant Massengill testified that he was able to determine the area of impact and that the crash occurred in the eastbound lane, which was the lane in which the victim was traveling. He identified a photograph depicting a 51-foot tire mark from the Defendant's vehicle inside the victim's lane pre-impact. Based on the type of tire mark, Sergeant Massengill stated that the mark was indicative of "partial breaking" and the Defendant "trying to get back to the westbound lane." He also identified a photograph depicting where the victim's vehicle was at the time of the crash. He explained that the vehicle was in the victim's lane of travel at the time of the crash, and there were no "pre-impact marks from [the victim] indicating that he tried to avoid anything or . . . maybe didn't have time to." Sergeant Massengill stated that based on the measurements of the marks at the crash scene, the victim's vehicle would have had its motion completely stopped by the impact. He reiterated that the Defendant's vehicle was "well out of his correct lane of travel" at the time of impact.

Sergeant Massengill used a model car to recreate the crash and summarized his findings, explaining that the Defendant's vehicle was traveling westbound on Little Valley Road and crossed into the victim's lane. The Defendant then tried to get his vehicle back into his lane, leaving tire marks showing "partial breaking and a maneuver to avoid." The impact occurred with the Defendant's vehicle "not quite head on, it was more of a caught the front of the [victim's] truck[.]" When asked whether the evidence obtained in his investigation supported the Defendant's version of the crash, Sergeant Massengill stated that "none" of the evidence was consistent with the Defendant's version of events. He explained that based on the Defendant's allegedly traveling 40 miles per hour and the

average reaction time, the "crash would not have occurred where it did" if the Defendant's account of the crash was accurate. He further explained that there was no evidence indicating that the victim's vehicle ever entered the Defendant's lane.

On cross-examination, Sergeant Massengill clarified that despite the victim's odometer being "stuck" at 23 miles per hour, "there was no way to back that up[.]" He affirmed that the victim's vehicle did not leave any "brake marks[.]"] He agreed that it was "possible at the top end of th[e] hill that you might not be able to see all the way" to the straightaway of Little Valley Road. Sergeant Massengill also affirmed that based on his findings, he concluded that "the negligent operation of [the Defendant's] vehicle by him failing to maintain a proper lane coupled with a probability of speeding and a possible drug impairment" was the "primary contributor" to the victim's death. He testified that the Defendant's assertion that he was traveling 40 miles per hour on Little Valley Road, where the speed limit is 35 miles per hour, was "not consistent necessarily with the damage that was caused to [the victim's] vehicle at impact. So it's very likely that [the Defendant] was going 40 miles per hour, if not faster, but I didn't use if not faster for my conclusion."

On redirect examination, Sergeant Massengill agreed that there "could be other contributing factors" to the crash that were not listed in his report. He responded affirmatively when asked whether the Defendant driving on a revoked license, not having registration, and not having insurance "could be" considered "contributing factor[s.]" He responded, "That's true," when asked if the Defendant "would have been on the road" for the crash to occur if he were "worried about obeying the law and not driving[.]"

On recross-examination, Sergeant Massengill clarified that although the factors discussed on redirect examination were "in the case file as a whole[,]" he did not list the factors in his final conclusive report.

Dr. Christopher Lochmuller testified that he was the chief deputy medical examiner for Knox and Anderson County and also served as a forensic pathology consultant for other counties in Tennessee. He also explained that his facility, the Regional Forensic Center, conducted "all autopsies that originate in Union County[.]" Dr. Lochmuller was received by the court as an expert in forensic pathology. He testified that he performed the victim's autopsy. He stated upon initial external observation, the victim had an obvious injury to the forehead, consistent with his impacting the steering wheel, bruises and scrapes throughout the body, obvious deformities from fractures in his left thigh and right ankle, all demonstrating "significant blunt trauma[.]" Dr. Lochmuller said that the state of the victim's body was consistent with the force from "a motor vehicle accident" or a fall "from a several story window or off of a roof." Upon completing an internal exam of the victim, Dr. Lochmuller found "several ribs that were broken in more than once place," also known as a "flail chest," which "limits [the] ability" to bring air into the lungs. He also discovered

that the victim had a torn liver, causing bleeding into the abdomen, a skull fracture, a bruised brain, two fractures to his left femur, a broken right ankle, two fractures to his right arm, and a fracture to his left wrist. Dr. Lochmuller concluded that it was "the totality" of the victim's "multiple blunt force injuries" that caused his death. He stated that the victim's injuries were "significant" and caused him to live only 21 minutes after the crash. Dr. Lochmuller submitted the victim's blood for toxicology testing, and it showed blood alcohol level of .029, which was "well below the presumed level of intoxication under Tennessee law." Photographs of the victim's autopsy were received as exhibits.

On cross-examination, Dr. Lochmuller testified that although alcohol can "make you feel tired," the amount in the victim's blood analysis was "well below the legal limit which means that that level that he's at, he should be able to function [sic] his motor vehicle without any issues." On redirect examination, Dr. Lochmuller agreed that alcohol was a "legal substance" in Tennessee.

The Defendant elected not to testify on his own behalf. At the close of all proof, the Defendant moved for a judgment of acquittal, which the court denied. The trial court classified the Defendant as Range III, persistent offender and imposed a total effective sentence of 15 years' incarceration. On March 4, 2019, the Defendant filed a motion for new trial, arguing that the evidence was insufficient to sustain his conviction, that the trial court erred in denying his motion in limine, and that Agent Carlisle testified outside the scope of her expertise. Following a hearing, the trial court denied the motion for new trial by written order on November 9, 2020. This timely appeal followed.

## ANALYSIS

I. **Admissibility of Toxicology Reports and License Status under Rule 404(b)**.[5] The Defendant argues that he was unfairly prejudiced pursuant to Tennessee Rule of Evidence 404(b) by the admission of his toxicology reports and his license status. The State responds that because the Defendant did not object to the toxicology or licensing evidence under Rule 404(b) at trial, he has waived the issue. In his reply brief, the Defendant asserts that this court should review the issue for plain error. We agree with the State.

Tennessee Rule of Evidence 404(b) states:

---

[5] The Defendant's brief contains an errant one-sentence argument that states, "Further, Ms. Carlisle's testimony surmising that an afternoon nap may have indicated the influence of a stimulant was outside the scope of her expertise, and still failed to establish a nexus between any prior methamphetamine use and the car accident." To the extent that the Defendant intended to raise her expert testimony as an issue on appeal, it is waived. See Tenn. R. App. P. 27(a)(4), Tenn. Crim. App. R. 10(b).

**Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Pursuant to the Advisory Commission Comment to Rule 404, "evidence of other crimes should usually be excluded." Tenn. R. Evid 404(b), Adv. Comm'n Cmt. However, in exceptional cases, "where another crime is arguably relevant to an issue other than the accused's character," such as "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake," the evidence may be admissible. Id.; see State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (stating that evidence of other crimes, wrongs, or acts may be admissible if it establishes the defendant's motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation).

If a trial court does not substantially comply with the procedural requirements of Rule 404(b), then this court will review the trial court's admissibility ruling de novo. State v. Clark, 452 S.W.3d 268, 287 (Tenn. 2014). However, if a trial court substantially complies with the rule's requirements, the court's ruling will not be overturned absent an abuse of discretion. Id. (citing State v. Kiser, 284 S.W.3d 227, 288-89 (Tenn. 2009); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). This court will find an abuse of discretion "only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008) (citing Konvalinka v. Chattanooga–Hamilton County Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

- 9 -

**A. Toxicology Reports.** As an initial matter, we note that a party on appeal is bound to the ground of the objection that it asserted at trial. See State v. Schiefelbein, 230 S.W.3d 88, 129 (Tenn. Crim. App. 2007) (citing State v. Adkission, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994); Tenn. R. Evid. 103(a)(1)); see also Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Although the Defendant filed a motion in limine to exclude the toxicology reports, he did not reference Rule 404(b) in the written motion or in his argument to the trial court. Instead, he argued that the toxicology reports were overly prejudicial and lacked probative value. He orally reiterated that argument to the trial court. The Defendant also asserted that the toxicology reports should have been excluded in his motion for new trial but again did not cite Rule 404(b) grounds as reason for exclusion. Consequently, the Defendant has waived any issue regarding the admission of this evidence pursuant to Rule 404(b) because he did not object to this evidence on this ground at trial.

Because the Defendant has waived this issue, we may only review it for plain error. Under the plain error doctrine, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing U.S. v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. We evaluate the Defendant's claims of error with these principles in mind.

From our review of the record, the Defendant has not established that plain error review is warranted. First, the record does not clearly establish what occurred in the trial court regarding the arguments on the motion in limine. As we noted above, the trial court referenced a "404 balancing test," but it is unclear whether it was referring to the 403

- 10 -

balancing test or the 404(b) balancing test.  The Defendant failed to reference either rule, and the balancing test was not referenced again.  Further, because trial counsel apparently did not object under Rule 404(b) or request a jury-out hearing, the trial court was unable to "determine that a material issue exist[ed] other than conduct conforming with a character trait[.]"  Tenn. R. Evid. 404(b)(2); see State v. Jonathan Mitchell Grimes, No. W2014-00786-CCA-R3-CD, 2015 WL 3929694, at *10 (Tenn. Crim. App. June 26, 2015).  Second, we are also unable to conclude that a clear and unequivocal rule of law was breached in admitting the toxicology reports.[6]  A trial court is able to conduct a sua sponte Rule 404(b) hearing but is not "obligated to conduct such a hearing absent a request."  State v. Hall, 958 S.W.2s 679, 707 (Tenn. 1997) (app'x).  Because the Defendant did not request a 404(b) hearing, the trial court was not obligated to conduct one.  We need not consider the remaining plain error factors as the Defendant has failed to show that the first two factors are satisfied.  The Defendant is not entitled to relief.

**B. License Status.**  The Defendant also asks us to review the admission of evidence of his revoked license status under Rule 404(b) or alternatively under plain error analysis.  Similarly to the preceding section, the Defendant did not object to evidence of his revoked license status on Rule 404(b) grounds.  The issue was not included in his motion in limine, and in his motion for new trial, he asserted only that his revoked license status did not constitute recklessness, without reference to any authority other than the statutory definition of recklessness.  See Tenn. Code Ann. § 39-11-302(c).  The record reveals that outside of the motion for new trial and a brief pre-trial discussion regarding his guilty plea to the revoked license charge, the Defendant never objected to any reference to his license status.

The Defendant asserts that "[a]ny rational juror could only surmise that [the Defendant's] license was revoked for DUI—or something worse."  He cites State v. Fleece, 925 S.W.2d 558 (Tenn. Crim. App. 1995), for the assertion that the jury hearing evidence of the Defendant's revoked license status mandates a reversal of his conviction.  In Fleece, the Defendant was charged with DUI, and the State elicited testimony from the arresting officer that the Defendant was driving on a restricted license that only allowed him to drive "[t]o and from work."  Id. at 560.  The State further elicited testimony from the Defendant that he could only drive "between the hours of 6:00 a.m. and 6:00 p.m." on his restricted license.  Id.  The State finally elicited testimony from an employee of the criminal court clerk's office regarding the restricted license and the "restricted order signed by a judge" as part of the general sessions record.  Id.  During the examination of the criminal court clerk employee, the State "waved around and passed back and forth to the witness" the

---

[6] We note that the State asserts Rule 404(b) is wholly inapplicable to the toxicology reports. Because the Defendant has not otherwise established that plain error review is warranted, we need not address this assertion.

Defendant's previous DUI jacket. Id. This court concluded that such circumstances created the "impermissible inference" that the defendant had a previous DUI conviction. Id. at 561.

Our review of Fleece reveals that it is easily distinguishable from the instant case. In Fleece, that defendant was charged with DUI, and the State created circumstances that would allow the jury to assume that he was previously convicted of the same crime, like waving his previous DUI jacket around and eliciting testimony that a judge had signed a restrictive order. The Defendant asserts that the jury automatically knew that the Defendant's license could only have been revoked under Tennessee law for "driving under the influence, vehicular assault, or vehicular homicide." However, nothing in the record indicates that the State implied that the Defendant's license was revoked as a result of DUI, unlike the State in Fleece. We reiterate that the Defendant never objected to the references to his license status, unlike the defendant in Fleece. Further, even if the references to his license status were admitted in error, we conclude the error was harmless given the other proof at trial of the Defendant's recklessness. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b); State v. Cannon, 254 S.W.3d 287, 298-99 (Tenn. 2008) ("We apply a harmless error analysis to 'virtually all evidentiary errors.'"). In this case, the State produced evidence that the Defendant had consumed marijuana and methamphetamine in the previous 24 hours, had driven over the speed limit down an admittedly narrow, hilly two-lane backroad over a "rolling hill," and had driven at least halfway into the victim's lane while looking down, hitting him almost head-on and striking his vehicle so hard that it immediately ceased forward momentum. Because there was otherwise ample evidence of the Defendant's recklessness, any error in the admission of his revoked license was harmless, and the Defendant is not entitled to relief.

**II. Sufficiency of the Evidence.** The Defendant contends on appeal that the State failed to prove every element of vehicular homicide by recklessness beyond a reasonable doubt. The State responds that a "reasonable jury could easily conclude that [the] Defendant was guilty of vehicular homicide." We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest

legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.  State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); Hall, 976 S.W.2d at 140.  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'"  Dorantes, 331 S.W.3d at 379 (quoting Hanson, 279 S.W.3d at 275).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.  Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).  When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury."  Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As charged in this case, vehicular homicide is the "reckless killing of another by the operation of an automobile…as the proximate result of…[c]onduct creating a substantial risk of death or serious bodily injury to a person."  Tenn. Code Ann. § 39-13-213(a)(1).  A person acts recklessly when the person "is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur."  Tenn. Code Ann. § 39-11-302(c).  The risk must be such "that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]"  Tenn. Code Ann. §§ 39-11-106(a)(33), -302(c).

"[C]ausation is an essential element of every homicide offense[.]"  State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001).  Such proximate causation "is generally established in Tennessee by showing that the victim's death was the natural and probable result of the defendant's unlawful conduct."  Id. at 203.  However, "[t]he defendant's unlawful act . . . need not be the sole or immediate cause of the victim's death."  Id. (citing Letner v. State, 299 S.W. 1049, 1051 (Tenn. 1927)); see State v. Roberson, 644 S.W.2d 696, 698 (Tenn. Crim. App. 1982).  "'It is only necessary that the defendant unlawfully contributed to the death of the deceased.'"  State v. Richardson, 995 S.W.2d 119, 125 (Tenn. Crim. App. 1998) (quoting Roberson, 644 S.W.2d at 698).  Causation in a criminal case is a question of fact to be determined by the jury based on the evidence presented at trial.  Farner, 66 S.W.3d at

204. Consequently, "a jury's determination of the causation issue will be reviewed under the familiar sufficiency of the evidence standard and will not be disturbed by an appellate court so long as the evidence is sufficient to support the jury's determination." Id.

The Defendant contends that the State's proof regarding recklessness and causation stemmed from the Defendant's lack of a valid license, lack of proper registration, lack of insurance, and improper plates. The Defendant cites State v. Timothy Gose, No. 03C01-9406-CR-00244, 1996 WL 30992, at *3 (Tenn. Crim. App. Jan. 26, 1996), for the assertion that his conduct demonstrated negligence rather than recklessness. In Gose, the defendant was traveling approximately ten miles over the speed limit while cresting a hill, looked down to his floorboard momentarily, lost control of the vehicle, crossed into the opposing lane, and killed the driver of the truck he struck. Id. at *1. However, unlike Gose, other factors in the instant case demonstrate the Defendant's recklessness. He admittedly smoked marijuana prior to the crash and had methamphetamine in his system. He was speeding, even if by a small margin, on a narrow, two-lane back road. He was distracted enough not to see the victim's vehicle, which, based on his cousin's testimony, was traveling well under the speed limit. See State v. Christopher Dale Gibbs, No. 01C01-9611-CC-00464, 1198 WL 85288, at *3 (Tenn. Crim. App. Feb. 20, 1998) (determining that, "unlike Gose," the defendant's slight speeding around a hill, coupled with a headache and consuming a limited amount of alcohol before the crash, constituted recklessness).

In the light most favorable to the State, the evidence shows that the Defendant consumed both marijuana and methamphetamine sometime in the 24 hours preceding the crash. He was driving at least five miles over the speed limit on an admittedly "narrow, hilly, back road" while going over a "rolling hill." The Defendant asserted that he looked down momentarily to change gears, and he veered into the victim's lane, leaving a "51-foot tire mark" before hitting the victim's vehicle head on. The impact of the crash caused the victim to completely stop his forward momentum, and he suffered catastrophic injuries and died at the crash scene. Despite the Defendant's arguments to the contrary, the evidence presented at trial did not rely solely on the Defendant's lack of license or registration compliance as the proximate cause of the victim's death. Instead, the Defendant's crossing into the victim's lane and hitting his vehicle head on was presented as the proximate cause of the victim's death. The jury was not required to believe the Defendant's version of what occurred during the crash. A rational jury could infer, regardless of the Defendant's license or registration status, that his speeding over a hill on a narrow hilly back road, coupled with his drug use and admission of looking down while driving on a dangerous road, was a gross deviation from the standard of care that an ordinary person would exercise under all of the circumstances. The Defendant is not entitled to relief.

**III. <u>Sentencing.</u>** The Defendant finally contends that the trial court erred in applying enhancement factor (6), that the injuries inflicted upon the victim, or the amount of damage to property sustained by the victim, was particularly great and enhancement factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high. The State concedes that enhancement factor (10) was erroneously applied but asserts that regardless of the misapplication of enhancement factors, the within-range sentence imposed by the trial court is still valid. We agree with the State.

We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." State v. Carter, 254 S.W.3d 335, 344-345 (Tenn. 2008).

Upon imposing a sentence, a trial court must consider the following: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in § 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b)(1)-(7). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. § 40-35-102(3)(C) and 40-35-103(5). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

In the instant case, there is no dispute that the Defendant was subject to a sentencing range of ten to fifteen years as a Range III, persistent offender, which was to be served at forty-five percent. See Tenn. Code Ann. §§ 40-35-112(c)(3), -501(e). On appeal, the Defendant does not contest the trial court's application of enhancement factor (1), that the Defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range, enhancement factor (8), that the Defendant failed to comply

with the conditions of a sentence involving release into the community, or enhancement factor (13), that the Defendant was released on probation at the time he committed the felony. See Tenn. Code Ann. § 40-35-114(1), (8), (13)(c).

The Defendant argues, and the State agrees, that the trial court erred in its application of enhancement factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high. Our supreme court has stated that, relevant to vehicular homicide, enhancement factor (10) "is applicable only when there is proof that the defendant's conduct in committing the offense created a high risk to the life of someone other than the victim." State v. Trent, 533 S.W.3d 282, 294 (Tenn. 2017). Because no such proof exists in the instant case, we conclude that the trial court erroneously applied enhancement factor (10).

With respect to enhancement factor (6), the Defendant argues that its application was "erroneous given the circumstances." The States argues that the factor is applicable because the Defendant "completely destroyed" the victim's vehicle. This court has repeatedly concluded that enhancement factor (6) is applicable in vehicular homicide cases where the victim's vehicle was destroyed. See, e.g., State v. Russell E. Mills, No. M1999-2505-CCA-R3-CD, 2000 WL 1336685, at *5 (Tenn. Crim. App. Sept. 15, 2000) (upholding enhancement factor (6) in a vehicular homicide case and discussing the history of this court reaching the same conclusion). However, unlike the previous decisions upheld by this court, no evidence was ever presented regarding the valuation of the victim's vehicle in the instant case. In fact, evidence was presented that the victim's truck was an older model year that did not contain airbags. We conclude that the trial court erroneously applied enhancement factor (6).

Despite the erroneous application of two enhancement factors, we reiterate the trial court applied three enhancement factors which are not in dispute. Our review of the record reflects that the trial court appropriately considered the evidence, the enhancement and mitigating factors, and the principles of sentencing before imposing the within-range sentence of fifteen years for the offense. See Bise, 380 S.W.3d at 708. The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE